**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **RAMSEY MITCHELL,** | § | |
| | § | |
| *Plaintiff*, | § | **CIVIL ACTION NO. 1:21-cv-00388** |
| | § | |
| **v.** | § | |
| | § | |
| **WILLIAMSON COUNTY, TEXAS,** | § | **JURY TRIAL DEMANDED** |
| **ROBERT CHODY, ZACHARY CAMDEN,** | § | |
| **MARK LUERA, JAMES JOHNSON,** | § | |
| **CHARLES DUVAL, LORENZO** | § | |
| **HERNANDEZ, A&E TELEVISION** | § | |
| **NETWORKS, LLC, and BIG FISH** | § | |
| **ENTERTAINMENT, LLC,** | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Ramsey Mitchell (hereinafter "Plaintiff" or "Mitchell"),

complaining of Defendants, Williamson County, Texas ("the County"), Robert Chody ("Chody,"

"Sheriff Chody," or "the Sheriff"), Zachary Camden ("Camden" or "Defendant Camden"), Mark

Luera ("Luera" or "Defendant Luera"), James Johnson ("Johnson" or "Defendant Johnson"),

Charles Duval ("Duval" or "Defendant Duval), Lorenzo Hernandez ("Hernandez" or "Defendant

Hernandez"), A&E Television Networks, LLC ("A&E Network"), and Big Fish Entertainment,

LLC ("Big Fish Entertainment"), and for cause would show the Court as follows:

## I.     NATURE OF THE ACTION

1. Policing is not meant for entertainment.

PLAINTIFF'S ORIGINAL COMPLAINT                                                    Page 1

2.  On June 14, 2019, Ramsey Mitchell was brutally assaulted by deputies with the Williamson County Sheriff's Office (the "WCSO") after being pulled over for allegedly missing a front license plate. After pulling Mitchell over, deputies issued a call to have a film crew from the television program "Live PD" come and film the encounter with Mitchell. Virtually the entire encounter with Mitchell, including the assault by five deputies, was captured on Live PD and broadcast on national cable television with the A&E Network and its production company Big Fish Entertainment.

3.  Live PD was featured on the national A&E Network before the program was cancelled by the A&E Network and Big Fish Entertainment in the wake of national protests over the death of George Floyd and police brutality.

4.  This is an action brought by Plaintiff against Defendants, Williamson County, Texas, Robert Chody, Zachary Camden, Mark Luera, James Johnson, Charles Duval, and Lorenzo Hernandez for their use of excessive force under the color of state law resulting in Plaintiff's injuries in violation of his rights under the Fourth Amendment of the United States Constitution secured pursuant to 42 U.S.C. § 1983.

5.  This action also asserts claims for negligence, gross negligence, and civil conspiracy against A&E Network and Big Fish Entertainment for instructing and encouraging sheriff deputies with Williamson County to engage in excessive force for viewer entertainment on Live PD.

6.  Plaintiff further asserts claims under state law for intentional infliction of emotional distress, assault, and battery against Defendants Camden, Luera, Johnson, Duval, and Hernandez.

7. Plaintiff alleges that Williamson County and its Policymakers, specifically Sheriff Robert Chody and the County Commissioners Court, failed to properly train, supervise, screen, discipline, transfer, counsel, or otherwise properly equip and control deputies including those who are known, or who should have been known, to engage in the use of excessive force. Further, Williamson County failed to properly implement training and policies governing the appropriate use of lethal and non-lethal force on members of the public.

8. The Policymakers had a duty, but failed to implement and/or enforce policies, practices and procedures for the WCSO that respected Plaintiff's constitutional rights to protection under the law. This duty was delegated to Defendant Chody to carry out the actions and policies of the County Commissioners by overseeing the day-to-day operation of the WCSO.

9. Defendant County and its Policymakers' failure to adequately supervise, discipline, and train the individual Deputy Defendants, failure to implement the necessary policies and procedures, and affirmative implementation of unconstitutional policies caused Plaintiff's unwarranted and excruciating physical and mental anguish and injuries.

10. The Deputy Defendants acted in an objectively unreasonable manner and disregarded the rights of Plaintiff, knowing that the County and Defendant Chody would approve and/or ratify their actions.

11. For these civil rights violations and other causes of action discussed herein, Plaintiff seeks redress and compensation for damages in his unjustified assault.

## II.   <u>PARTIES</u>

12. Plaintiff, Ramsey Mitchell, is an adult individual and a resident of Diboll, Texas.

13. Defendant, Williamson County, Texas is a governmental entity duly organized and existing under the laws of the State of Texas. It may be served through its County Judge, Bill Gravell, Jr., at 710 S. Main St. #101, Georgetown, TX 78262.

14. Defendant Robert Chody, at all times relevant, was the elected Sheriff of Williamson County and an agent, employee, and Policymaker of Williamson County acting within his scope as such. At all times material hereto, Defendant Chody was acting under color of law. He may be served through the Williamson County Sheriff's Office at 508 S. Rock St., Georgetown, TX 78626, or wherever he may be found.

15. Defendant Zachary Camden is and/or was a deputy sheriff with the Williamson County Sheriff's Office. At all times material hereto, Defendant Camden was acting under color of law. He may be served through the Williamson County Sheriff's Office at 508 S. Rock St., Georgetown, TX 78626, or wherever he may be found.

16. Defendant Mark Luera is and/or was a deputy sheriff with the Williamson County Sheriff's Office. At all times material hereto, Defendant Luera was acting under color of law. He may be served through the Williamson County Sheriff's Office at 508 S. Rock St., Georgetown, TX 78626, or wherever he may be found.

17. Defendant James Johnson is and/or was a deputy sheriff with the Williamson County Sheriff's Office. At all times material hereto, Defendant Johnson was acting under color of law. He may be served through the Williamson County Sheriff's Office at 508 S. Rock St., Georgetown, TX 78626, or wherever he may be found.

18. Defendant Charles Duval is and/or was a deputy sheriff with the Williamson County Sheriff's Office. At all times material hereto, Defendant Duval was acting under color of

law. He may be served through the Williamson County Sheriff's Office at 508 S. Rock St., Georgetown, TX 78626, or wherever he may be found.

19. Defendant Lorenzo Hernandez is and/or was a deputy sheriff with the Williamson County Sheriff's Office. At all times material hereto, Defendant Hernandez was acting under color of law. He may be served through the Williamson County Sheriff's Office at 508 S. Rock St., Georgetown, TX 78626, or wherever he may be found.

20. Defendants Camden, Luera, Johnson, Duval and Hernandez are hereafter collectively referred to as the "Deputy Defendants."

21. On information and belief, Defendant A&E Network is a corporation organized under the laws of Delaware. A&E may be served by its registered agent for service of process, The Corporation Trust Company, at Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801. Defendant A&E Network has, at all times material hereto, been doing business in the State of Texas by filming, producing, and/or airing shows within this State.

22. On information and belief, Defendant Big Fish Entertainment is a corporation organized under the laws of New York and having its principal place of business in New York. Big Fish Entertainment may be served by and through its counsel, Elizabeth McNamara, Davis Wright Tremaine LLP, at 1251 Avenue of the Americas, 21st Floor, New York, NY 10020-1104. Defendant Big Fish Entertainment has, at all times material hereto, been doing business in the State of Texas by filming, producing, and/or airing shows within this State.

### III.   JURISDICTION AND VENUE

23. Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourth Amendment rights of Plaintiff Ramsey Mitchell. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

24. Venue is proper in this Court as Defendants' constitutional violations and intentional torts and otherwise violative conduct occurred within the Western District of Texas.

### IV.    FACTUAL ALLEGATIONS

25. On June 14, 2019, Deputies Johnson and Camden were out on patrol duty in Austin, Texas with a film crew from Live PD eagerly waiting to film an encounter between the deputies and anyone being pulled over or stopped by them.

26. Within less than 10 minutes, Johnson and Camden pulled over approximately 8 vehicles on the road in their search for an entertaining encounter for Live PD. Johnson and Camden spoke with each vehicle occupant for approximately 30 seconds or less before deciding to release the vehicle and conduct another traffic stop on other vehicles for either minor traffic violations or for no violation at all.

27. Camden initiated a traffic stop on Mitchell's vehicle for the alleged offense of failing to have a front license plate.

28. 6-7 minutes later Mitchell would be face down on the ground, unconscious in a pool of his own blood as deputies laughed and applauded each other for the brutal assault they initiated against Mitchell while filming for Live PD.

**A. Defendant Chody convinces Williamson County to contract with Big Fish**

**Entertainment for the filming of Live PD and WCSO sheriff deputies for reality television.**

29. Live PD was a reality television series featured on the A&E Network and broadcast nationally to millions of viewers from October 2016 to May 2020. The television program followed deputies with the WCSO and routinely aired encounters with civilians that were often humiliating and dramatized. Big Fish Entertainment was Live PD's production company responsible for producing, developing and editing the program.

30. The County's first encounter with a proposed reality television program was in June 2017 when Defendant Chody approached the County Attorney to engage the Commissioners Court about entering into an access agreement with Hit + Run Creative, Inc. for a television program featuring law enforcement at work. The County approved the agreement but the television program was never developed. The County subsequently terminated the agreement in December 2018.

31. Defendant Chody, still eager to appear on reality television, again approached the County about entering into another agreement for a television program centered around women in crime scene investigation. Defendant Chody participated in the pitch to the Commissioners Court seeking its approval of a contract between Williamson County and M2 Productions. Once again, the County approved the contract for production of this new television series on March 26, 2019. The series never materialized as the County instead decided to contract with Big Fish Entertainment for the filming of Live PD.

32. Defendant Chody personally appeared at the Commissioners Court to advocate for the access agreement between Williamson County and Big Fish Entertainment.  The access agreement would allow Chody and Big Fish Entertainment to use county vehicles, property and facilities for the production of Live PD. Defendant Chody argued that the

County should enter this agreement because it would help with law enforcement recruitment and outreach once the WCSO was featured on Live PD.

33. In January 2018 the Commissioners Court voted unanimously to enter into the access agreement with Big Fish Entertainment for the production of Live PD within Williamson County.

34. The County again re-authorized the access agreement with Big Fish Entertainment in 2019 – only 10 days before the assault on Plaintiff occurred and nearly 3 months after the death of Javier Ambler at the hands of Deputies Camden and Johnson that was also featured on Live PD.

35. Dan Cesareo, the creator of Live PD, stated, "The level of transparency 'Live PD' offers is unlike any other police series on television… When an officer from a participating police department gets a call, we act as a natural extension of body cams and dash cams that officers are already using, and never know what will transpire."

36. In reality, the television program interfered with prosecution by the Williamson County District Attorney's Office and continued to film and profit off the violation of residents' constitutional rights at the hands of WCSO deputies. The program routinely deleted video footage captured by producers despite knowledge that such video footage would likely be evidence in a criminal and/or civil investigation.

37. The contract between the County and Big Fish Entertainment called for raw video footage to be destroyed by Live PD producers within 30 days "except to the extent Producer is required to retain the Raw Footage pursuant to a valid court order or other state or federal laws."

**B. Williamson County and Defendant Chody incentivized deputies to use excessive force for the chance to appear on Live PD, be labeled a "Wilco Badass," and to earn steakhouse gift cards.**

38. Defendant Chody embraced his newfound celebrity after successfully lobbying the County into contracting with Big Fish Entertainment for the production of Live PD.

39. Defendant Chody frequently promoted Live PD's presence in Williamson County through Twitter, which saw his Twitter followers list grow by tens of thousands of users. Defendant Chody's Twitter account has since been deactivated.

40. Chody interacted with Live PD fans online, promoted trading cards, collectible poker chips, t-shirts and even prize giveaway contests.

41. One former Williamson County deputy stated that, "When 'Live PD' came on the scene, it was the glitz, the glamour, the light… Law enforcement went right out the window."

42. Among the several tweets promoting Live PD, Defendant Chody wrote the following:

    a. "I believe having #LivePD in WilCo is a necessary tool for our office for many reasons… [and] the community at a large scale approves."

    b. "The WCSO is proud & excited to announce that we will be featured on #LivePD this weekend!"

    c. "I want this shirt!!!!! #LivePD #LivePDNation" – tweeted in regards to a t-shirt with printed words of "Trust me. I watch Live PD, I'm basically a cop."

43. Former Williamson County deputy Christopher Pisa stated during the course of an investigation by the Texas Rangers that Commander Steve Deaton rewarded deputies he considered to be "Wilco Badass."

44. Deputy Pisa stated, "They had the intention that we were all 'Wilco badass' and, if you went out there and did your job and you had to use force on somebody and he agreed with it, then you would get a gift card."

45. Pisa's statement was corroborated by former sergeant Troy Brogden who confirmed that Commander Deaton would give gift cards to steakhouses to deputies "for what he considered good uses of force." Brogden further explained that the practice and discussion surrounding the encouragement of use of force was so prevalent that Deaton would "talk about it in groups, including supervisor meetings and classes."

46. In fact, after a violent arrest initiated by Pisa in April 2019, Pisa stated that he expected to receive a gift card from his supervisors within the WCSO.

47. Pisa further explained that it was "common knowledge" that Williamson County had a policy and practice of rewarding deputies with gift cards for "good" uses of force. Commander Deaton was responsible for reviewing these incidents and determining whether a deputy would be rewarded with a gift card.

48. Pisa noted that at least two of the deputies involved in the assault on Ramsey Mitchell, including Camden and Johnson, were rewarded with gift cards for their uses of force during encounters.

49. Camden and Johnson were rewarded with gift cards to places including Logan's Roadhouse after using force in one or more encounters.

50. The County's practice of rewarding deputies with gift cards after use of force incidents ultimately incentivized further use of force, and excessive force, which led to Plaintiff's constitutional rights being violated.

51. The County and Chody further incentivized use of force and violence by giving the most entertaining deputies the opportunity to showcase their policing on Live PD.

52. After beginning to film in Williamson County, Live PD became concerned that content coming from Chody and the County was not entertaining enough.

53. Producers with Live PD gave Chody an ultimatum – either engage in more entertaining encounters that could be aired on Live PD, which would include more use of force incidents, or Live PD would have to leave Williamson County and find a different and more entertaining department to film with.

54. Chody, not wanting to risk the end of the County's relationship with Live PD, decided to build and develop a group of Live PD "stars" that could regularly be featured on the show, that had entertaining personalities for cable television, and that were capable of engaging in high-risk encounters that would provide for entertaining content with Live PD.

55. Dispatchers were instructed by Chody and the County not to assign calls to deputies who were riding with Live PD. These deputies, including many of the Deputy Defendants, were marked by a special call sign for emergency dispatchers. Commander Deaton wrote in a memo, "This will let communications know that you are not to be assigned calls on a burglar alarm that had gone off."

56. When a dispatcher accidentally dispatched a Live PD deputy to investigate a burglar alarm, Chody personally called the dispatcher's supervisor to complain. The dispatcher explained that Live PD "added unnecessary stress to an already stressful environment… Most of us are there because we want to save lives. It became more or less that we were having to cater to and do our jobs around the show."

57. Live PD was not actually "live," and the different policing agencies that have appeared on the television program, including the WCSO, can selectively veto any content they do not want aired on the program.

58. Chody had editorial control over content aired on Live PD and authority to remove a segment from being broadcast on the television program.

59. Big Fish Entertainment's contract with Williamson County allowed Chody's office to not only review recorded segments, but also allowed a representative from Chody's office to be in the "local control room" to review footage as it was being recorded by Live PD cameras.

60. Chody's promotion of Live PD through social media operated under the guise of helping the County recruit more deputies, but, in reality, Chody sought to enhance his own celebrity and the celebrity of his department during the 29 weeks in which Live PD filmed in Williamson County.

61. Chody continued to allow Live PD to film within Williamson County even as the County remained under a "stay-at-home" order due to the COVID-19 pandemic. The Live PD crew thus began to operate as "essential workers" within the County.

62. Chody encouraged his deputies to engage in dangerous, high-risk police tactics, including the use of excessive force, because it would continue to enhance his celebrity, and the County's, by having entertaining appearances on Live PD.

63. One of Chody's deputies, Deputy Jarred Dalton, corroborated Chody's encouragement of violence by tweeting, "Glad we could make some good TV for the boss man," and "Gonna try to get some good stuff stirred up for y'all tonight."

64. Deputies who would be featured on Live PD, including the Deputy Defendants, were not only rewarded with gift cards and TV appearances for uses of force, but were further incentivized to use excessive force on camera because of the desire to go "viral" and obtain a large social media presence, much like Chody's online celebrity once the County began to be featured on Live PD.

65. The Deputy Defendants and Chody each began to see a growing social media presence due to their routine appearances on Live PD.

66. Television celebrity host Dan Abrams would regularly post photos of Live PD "line-ups" that would feature deputies across the country, including the Deputy Defendants, for fans of Live PD to see which of their favorite officers would be on television that night.

67. On the day of the assault on Mitchell, Defendant Duval tweeted a photo of a Live PD line-up that Dan Abrams shared on social media containing the names and faces of the stars of Live PD, "Kicking off Friday night #livepd with @Tac12Wilco, @SheriffChody @WilcoKnight1442 and @WilcoTac27. Let's get this party started gentleman!!!"

**C. Despite Chody, Deputy Defendants and Live PD's misconduct, the County failed to take action in removing Chody from office.**

68. Williamson County District Attorney Shawn Dick took issue with Chody and Live PD's filming in the county.

69. Dick's concern stemmed from the need to preserve footage, witness contact information, and the need to know whether Live PD had been involved in an arrest that was eventually sent to the DA's Office for prosecution.

70. Live PD was almost never mentioned in deputy offense reports and the DA's Office was routinely made unaware of Live PD's involvement in a case. Dick stated, "It was like pulling teeth just to find out if something was on 'Live PD'."

71. In June 2019, when the problem with Live PD reached a "boiling point," according to the District Attorney, Dick emailed Chody and reiterated that videos of deputies on Live PD "are evidence – just as the recording from a body cam or dash cam is evidence." Dick further explained that state law prohibits the destruction of evidence during an ongoing investigation.

72. However, Chody and Big Fish Entertainment continued to destroy the raw video footage, including the raw video footage of the assault on Plaintiff that occurred on June 19, 2019.

73. The District Attorney warned Chody that his office would be unable to prosecute cases where Live PD was involved if the raw video footage was not preserved and if the DA's Office continued to be denied information about Live PD's involvement in an arrest.

74. Since January 2019, at least 8 felony cases connected with Live PD were not prosecuted by the Williamson County District Attorney's Office.

75. The County Commissioner's Court had the authority and opportunity to begin removal proceedings against Chody for official misconduct by filing a petition in District Court but failed to do so.

76. At no time prior to the County's lawsuit against Chody did the County Commissioners Court move to have Chody removed from office for official misconduct despite knowledge of his ongoing policy of violating the constitutional rights of residents in the county.

PLAINTIFF'S ORIGINAL COMPLAINT                                                      Page 14

77. After the death of Javier Ambler and Plaintiff's assault, Texas state representative James Talarico called for Chody's removal and stated, "Defendant Chody's department killed a citizen that they were sworn to protect and serve… They filmed that killing for a reality TV show, and then they covered it up for 15 months and withheld the truth from the public. If that's not official misconduct, if that's not incompetency, then I don't know what is."

78. In August 2019 the County Commissioner's Court voted to end filming of Live PD within the County. Chody ignored the County's demand and insisted he had the authority as Sheriff to continue to allow Live PD to film within the County.

79. Chody continued to allow the filming of Live PD in Williamson County despite the County's decision to terminate the contract with Big Fish Entertainment. Further, Big Fish Entertainment was on notice that the County had terminated the access agreement. Despite this knowledge, Big Fish Entertainment decided it would continue to film in Williamson County.

80. In May 2020 the County filed a lawsuit against Chody alleging that the County had the sole authority on decision-making regarding Live PD's presence in the County and that Chody had secretly signed a new contract with Big Fish Entertainment without the knowledge or permission of the County.

81. The County's lawsuit against Chody claimed, "Defendant Chody can perform the core duties of sheriff without the live TV show. But he doesn't want to. Instead, Defendant Chody seeks social media and TV exposure like a moth to a light bulb – and he's flown out of his job description to get back on TV."

82. Rather than serving as a responsible sheriff, the County further alleged that Chody had become a "TV producer, reality TV star, [and] show business agent," while jeopardizing "citizen protection for TV ratings and exposure" by "prioritize[ing] TV appearance[s] and ratings over safety and proper police work."

83. County Commissioner Russ Boles stated that, "'Live PD' is here to film a for-profit TV show. They're not here to be our friends. They're not here to support our community. They are here for the money."

84. Boles further noted that, "For all [of Chody's] showmanship, there have been zero 'Live PD' prosecutions by the [district attorney] because the sheriff won't provide the necessary evidence. The sheriff seems to refuse to collect any evidence as it relates to 'Live PD.' And because of this, the DA has to dismiss every one of those cases. The sheriff knows this. He knows what's going to happen. He doesn't seem to care. He likes being on TV and he doesn't want to get 'Live PD' upset."

**C. The June 14, 2019 assault on Ramsey Mitchell by Deputy Defendants while filming for Live PD.**

85. On June 14, 2019, Ramsey Mitchell was visiting a friend at an apartment complex in Austin, Texas.

86. Mitchell had visited his friend to ask for help with collecting and selling scrap metal for extra cash as Mitchell planned to purchase birthday presents for his step-daughter's birthday that would be taking place that weekend.

87. As Mitchell was preparing to leave the apartment complex, Deputies Johnson and Camden were out on patrol near the apartment complex. Johnson and Camden had a film crew with Live PD on standby at a close location as the two deputies searched for an

encounter and/or interaction with the public that could be used as entertaining content for Live PD.

88. Johnson and Camden collectively initiated traffic stops on approximately 8 vehicles in less than 10 minutes.

89. Upon information and belief, these vehicles were pulled over for either minor traffic violations or for no traffic violations at all.

90. After speaking with each vehicle's occupants, Johnson and Camden returned to their service vehicles and initiated more stops on other vehicles.

91. As Mitchell exited the apartment complex in his vehicle, he was suddenly being pulled over by Johnson who initiated a traffic stop as Mitchell pulled over to the side of the road.

92. Johnson approached Mitchell and instructed him to turn his vehicle off and stay seated while the Live PD film crew arrived on scene. Johnson waited to continue the encounter until and only after the Live PD film crew arrived to film his encounter with Mitchell.

93. Given that it was the middle of the summer in Texas, the temperature was high as Mitchell sat in his vehicle with the air conditioning turned off as they waited for the Live PD film crew to arrive and begin filming.

94. Mitchell was forced to wait several minutes until the Live PD film crew arrived to attempt to learn why he had been pulled over.

95. Live PD falsely reported on the television program that Mitchell was "driving without a license plate." In fact, Mitchell had been stopped only for allegedly not having a front license plate.

96. Mitchell's stop in reality was a pretext stop for the purpose of filming an entertaining episode of Live PD with the Deputy Defendants.

97. Deputies Camden, Johnson and Luera began to aggressively question Mitchell once the Live PD film crew arrived. The scope of their questioning had nothing to do with the reason Mitchell was stopped. In fact, questioning by Camden, Johnson and Luera was designed to make for entertaining television and to also find a reason to escalate the encounter with Mitchell.

98. When Johnson and Luera learned that Mitchell did not have his driver's license on his person and that the encounter was coming to a close, they suddenly concocted reasons to further escalate the encounter.

99. Rather than return to their patrol vehicles to conduct a search on Mitchell's license plate, as is common police practice, Camden, Johnson and Luera chose to continue the conversation with Mitchell in the hopes that an interesting interaction would transpire.

100. Luera suddenly asked Johnson, "You smell beer in here?" Johnson replies, "I smell alcohol."

101. Mitchell denied possessing or consuming alcohol before or while he was driving his vehicle.

102. In an effort to make it seem as if Mitchell was being unusually nervous about the encounter, Mitchell is asked by Luera why he was sweating, to which Mitchell replied, "It's like 100 degrees out here… I am very warm… It is hot."

103. Johnson, Luera and Camden decided to remove Mitchell from the vehicle to perform standardized field sobriety tests.

104.    While being searched for weapons, Mitchell attempted to evade the encounter but is only able to take a few steps before being tackled by Johnson, Luera and Camden, slammed to the ground, and assaulted.

105.    While Mitchell remained in a defensive position on the ground with his head tucked in towards his body, Johnson proceeded to unjustifiably punch Mitchell in the face from the right side of Mitchell's body while Camden unjustifiably punched Mitchell in the face from the left side of Mitchell's body.

106.    At approximately the same time as the punches were thrown by Johnson and Camden, Luera unjustifiably thrusted his knee into Mitchell's face and head multiple times while standing directly in front of Mitchell. Luera's blows to Mitchell's face fractured Mitchell's orbital eye socket and would later require extensive reconstructive surgery.

107.    Mitchell was not resisting arrest or detainment and continued to remain in a defensive position while shielding his face and head from more strikes by Johnson, Camden and Luera.

108.    Johnson began to tase Mitchell as Mitchell lay in a fetal position on the ground.

109.    Luera repeatedly yelled "lay over," while continuing to thrust his knee into Mitchell as Johnson, Camden and Luera collectively prevented Mitchell from following their commands.

110.    Given the restraint on Mitchell, it was impossible for Mitchell to comply with deputy commands, even more so as the deputies continued to assault Mitchell without giving him the chance to place his hands behind his back.

111.    Luera yelled "hit him again," while Camden continuously kneed Mitchell in his spine and back. Johnson used his taser against Mitchell for a second time as Mitchell screamed in pain.

112.    Deputies yelled at Mitchell to lay on his face, an impossible request given the fact that during this time Mitchell was in a seated position with his head close to his knees as three deputies restrained him in the same position and remained on his back. Throughout this time, Johnson continued to tase Mitchell.

113.    Mitchell was again hit and kneed in the face by Johnson, causing Mitchell to collapse on his own back.

114.    While Johnson, Camden and Luera attempted to handcuff Mitchell, Luera unjustifiably proceeded to place Mitchell in a chokehold restraint.

115.    Mitchell gasped for air and struggled to breathe while being restrained by Luera's chokehold.

116.    Despite being in Luera's chokehold, Johnson and Camden continued to yell at Mitchell to "roll over," which was an impossible demand to comply with given that the deputies were physically restricting any sort of movement from Mitchell.

117.    As Mitchell gasped and struggled for breath, he repeatedly told the restraining deputies, "I can't breathe."

118.    When Defendant Charles Duval arrived on scene, he quickly joined the unnecessary restraint by sitting on top of Mitchell's person, further restricting Mitchell's ability to turn over and comply with deputy commands.

119.    When Duval arrived, Mitchell begged Duval for help by gasping, "Help me… I can't breathe."

120.     As Mitchell continues to gasp "I can't breathe," Duval drew his taser and began to tase Mitchell again for no justifiable reason, despite four deputies now restraining Mitchell while he was in the chokehold.

121.     After again being tased, Deputy Lorenzo Hernandez arrived on scene with his taser drawn and joined the restraint on Mitchell.

122.     At this point there were five deputies contributing to Mitchell's unnecessary restraint and assault.

123.     After Duval punched Mitchell in his shoulder for no justifiable reason, Hernandez followed suit by punching Mitchell directly to his back 4 times for no justifiable reason.

124.     With five deputies on his back and while being continuously placed in Luera's chokehold, Mitchell was rendered unconscious in a pool of his own blood.

125.     After being handcuffed and as Johnson, Camden and Duval released their restraints, Luera continued to have Mitchell in the chokehold for several more seconds for no justifiable reason.

126.     Mitchell was then dragged to the side of the roadway, still unconscious.

127.     Mitchell eventually regained consciousness while on the side of the road and without provocation was kicked by Camden.

128.     Camden asked Mitchell, "Are you from around here?" Mitchell replied that he was not. Camden replied "Well this is how we do it in Williamson County."

129.     Luera examined Mitchell's injuries by lifting Mitchell's head off the ground and joked to Hernandez, "What do you think?" Hernandez responded, "Looks good to me" and that the Deputy Defendants did a good job.

130.     The Deputy Defendants then went to speak with a Live PD producer on scene to retrieve a media release form for Mitchell to sign so that they could air footage of Mitchell's assault on the television program.

131.     Camden demanded to know Mitchell's real name and attempted to force Mitchell to sign the media release. Mitchell, barely able to retain consciousness, replied that he needed to go to the hospital and that he would not sign any media release.

132.     The Live PD producer on scene urged Camden and the Deputy Defendants to get Mitchell's signature because it would be necessary to air the episode on television. Without the signed release they would have to blur Mitchell's face from the episode.

133.     Camden threatened Mitchell that if he did not give his real name and sign the media release then additional charges would be placed on Mitchell. Mitchell again refused to sign the release.

134.     The Deputy Defendants continued to deny Mitchell medical care and attention until he signed the Live PD media release.

135.     Once EMT arrive on scene they interrupted deputy attempts to force Mitchell to sign the Live PD media release and informed the deputies that Mitchell's jaw was visibly crooked and broken and that he needed to go to the hospital immediately.

136.     Defendant Deputies continued to delay Mitchell's transport to the hospital out of concern for signing the Live PD media release.

137.     Once Mitchell was eventually transported to the hospital on a stretcher, Deputy Defendants continued to joke and laugh at Mitchell because of his injuries.

138.    At one point, Camden commented, "That's what you get" and that "This ass-whooping will be the most exciting episode of the season" regarding Live PD's filming of the incident with Mitchell.

139.    Camden also stated that he would "go viral" on Facebook and "get a lot of pussy off this" after the incident.

140.    Deputy Defendants joked with Mitchell that he would be famous after this encounter on Live PD.

141.    Once at the hospital, Mitchell was confused and disoriented. When asked what year it was, he stated "19…19-90…19…" until the nurse told him he could stop.

142.    Mitchell stated to investigator Kyle Pence that he was scared about his interaction with Deputy Defendants due to what happened when Eric Garner was placed in a chokehold and killed in New York City. Mitchell felt as if he was about to die when he was placed in the chokehold and begged for help because he could not breathe.

143.    Mitchell left the hospital in a wheelchair, unable to walk or stand for several weeks after the assault.

144.    Mitchell never attempted to harm any of the Deputy Defendants in any way.

145.    Mitchell never verbally threatened any of the deputies in any way.

146.    Deputy Defendants never attempted to de-escalate the encounter, despite knowing that Mitchell posed no threat of harm. Even when Mitchell attempted to comply, it was an impossible task given the amount of force being used on him and that the Deputy Defendants were restricting his ability to comply with deputy commands.

147.     Mitchell was ultimately prosecuted for possession of a controlled substance and incarcerated.

148.     Williamson County District Attorney Shawn Dick called the assault on Mitchell, "a brutal takedown."

149.     The Texas Rangers began an investigation into the assault on Mitchell but have not taken any action or recommended any termination, discipline, or charges against the Deputy Defendants.

150.     Live PD aired an episode showing the encounter and assault on Mitchell and titled the episode "Wilco Deputies Fight off Druggie."

151.     While incarcerated after the incident, Mitchell was unable to walk, shower or get out of bed for approximately three weeks.

152.     Mitchell suffered a severe concussion resulting in loss of cognitive function, including memory loss.

153.     For the following four weeks after the assault, Mitchell would frequently bleed from his ear due to a busted ear drum and concussion he suffered at the hands of Deputy Defendants.

154.     Mitchell suffered an orbital eye socket fracture that required reconstructive surgery due to the damage. Mitchell continues to suffer partial blindness in his left eye even after surgery.

155.     Mitchell suffered a fractured jaw and pinched nerves within his jaw that will require surgery. To this day Mitchell's jaw frequently goes numb and loses feeling.

156.    Mitchell suffered a torn ligament in his left elbow that would have required surgery, but Williamson County delayed Mitchell's transport to a specialty surgeon that would have done Mitchell's surgery. As a result, the torn ligament has improperly healed and continues to cause Mitchell extraordinary pain.

157.    Mitchell suffered 2 broken teeth and 2 teeth that shifted within his jaw as a result of the assault.

158.    Mitchell suffered a nasal fracture as a result of the assault.

159.    Mitchell suffered and continues to suffer spinal damage resulting in 2 vertebrae becoming misaligned in his spine and causing extraordinary neck and back pain.

160.    Mitchell suffered and continues to suffer from near constant rectum bleeding as a result of the assault.

161.    Mitchell suffered a sprained ankle as a result of the assault.

162.    Mitchell was left bloodied and bruised as a result of the assault.



163.     Mitchell's injuries were so severe that for months after the assault he was required
         to see numerous doctors and medical specialists, including eye and vision
         specialists, elbow specialists, and spine specialists.

164.     Mitchell was prescribed pain medication, anxiety medication and sleep
         medication as a result of trauma sustained during the assault. After a mental
         evaluation of Mitchell combined with a physical assessment of his injuries, a
         psychiatrist recommended that Mitchell apply for disability benefits once his
         incarceration was over.

165.     Mitchell suffered and continues to suffer from these severe, permanent and life-
         altering injuries as a direct result of Deputy Defendants' use of excessive force
         that was caused by the County's policies, procedures, and training, and as a result
         of the lack of the same.

166.     Upon information and belief, none of the Deputy Defendants were disciplined for
         their use of excessive force against Plaintiff.

167.     In fact, Supervisor Roel A. Alafa noted in Defendant Camden's use of force
         report that Defendant Camden's use of force was "within the policy guidelines"
         and that "lesser force alternatives were not available," and that "training and
         proper tactics were followed."

168.     Commander Deaton further noted that "It should be noted that one of the deputies
         (Zac Camden) involved did I believe, use excessive profanity. He has been
         counseled regarding this matter and is aware that this can reflect negatively on the
         agency. There were also some inappropriate comments made after the incident
         was over that were captured on the recording system. These comments that were

made are being investigated by the OPM and that individual will be held accountable depending on the result of the investigation. This did demonstrate the need to remind our troops to turn off their recording devices once the incident is over and there is no longer any investigatory reason to have any on."

## D. Excessive force and misconduct within Williamson County and among the Deputy Defendants was rewarded by Chody, Policymakers and Live PD.

169.    Prior to Chody's tenure as Sheriff in Williamson County, the County conducted thorough background checks for all applicants seeking employment with the WCSO.

170.    Chody ended the practice of conducting thorough background checks, and instead implemented a policy where background checks would only examine minimal information.

171.    Under Chody's new policies, conduct that would have typically disqualified applicants would no longer be considered in the hiring determination process.

172.    Mike Klier, former president of the Williamson County Deputies Association, stated that Chody would hire his deputies based on their ability to entertain TV audiences rather than their ability to be effective deputies.

173.    Klier stated, "If you are looking for guys who are chasing Hollywood lights with blue [police] lights, you're going to get exactly what we got – and that is a disaster."

174.    As detailed below, Chody hired several problematic deputies who had either been disciplined or fired by other law enforcement agencies for misconduct, including the use of excessive force. These deputies, including the Deputy Defendants, had

a history of use of excessive force and continued this pattern of excessive force when they encountered, assaulted and nearly killed Plaintiff.

175.    On March 28, 2019, Javier Ambler was killed in an encounter involving Defendants Camden and Johnson during the filming of Live PD.

176.    Ambler was initially being stopped for failing to dim his headlights for oncoming traffic, but a high-speed chase ensued for approximately 20 minutes while Camden and Johnson spoke to the Live PD camera about the chase.

177.    When Ambler's vehicle crashed and he surrendered, Johnson still tased Ambler despite Ambler posing no threat and complying with Johnson's commands. When Camden arrived on scene, he used his taser to drive stun Ambler directly in his back for no justifiable reason.

178.    Ambler informed the deputies that he had congestive heart failure and repeatedly gasped, "I can't breathe." While Johnson and Camden continued their assault on Ambler, which included further use of the taser, Camden comments, "I'm pretty sure I broke his finger." After Ambler goes unconscious, the deputies fail to render any sort of aid to Ambler. The entire incident was captured by Live PD cameras.

179.    The county medical examiner classified Ambler's death as a homicide due to congestive heart failure and cardiovascular disease in combination with forcible restraint.

180.    Camden and Johnson were not disciplined for their actions in causing Ambler's death nor were they placed on administrative leave while the matter was being investigated. In fact, both Camden and Johnson continued to be on patrol and

PLAINTIFF'S ORIGINAL COMPLAINT                                                                Page 28

continued their roles on Live PD after Ambler's death. Less than three months later Camden and Johnson would participate in the assault on Ramsey Mitchell.

181.    Regarding employment with the WCSO, Defendant Johnson stated in a social media livestream while promoting Live PD that, "This was my dream agency when I got into the job, it just took me about seven years to make it back here."

182.    Upon information and belief, both Camden and Johnson had previously sought employment with the County but were denied prior to Chody's tenure as sheriff in the County due to problematic backgrounds.

183.    In 2005, Johnson was listed in a City of Austin police report for assault. In 2016, while working for the Bastrop County Sheriff's Office, Johnson was suspended for crashing his patrol car.

184.    Johnson was also involved in multiple high-speed and dangerous police chases while working for Chody and the County, including the chase that would lead to the death of Ambler and a chase that reached 100 miles per hour that Johnson began because the driver had his headlights off.

185.    Johnson was also involved in another high-speed and unnecessary chase because of a suspect whose vehicle allegedly had expired registration.

186.    During Camden's last five months with Bastrop County, he was disciplined at least three times. Bastrop County also required Camden to take additional courses on constitutional rights of suspects after Camden conducted a search on a home without legal justification.

187.    Once Camden applied to work for Chody and the County, two of Camden's references described Camden as being too "aggressive" when out on patrol.

188.     An internal investigation within the WCSO cleared both Camden and Johnson of any wrongdoing in Ambler's death in April 2019. In March 2021, Camden and Johnson were indicted on manslaughter charges for their roles in Ambler's death. Defendant Chody and the Williamson County general counsel were also indicted but for charges related to tampering with evidence stemming from the destruction or concealing of audio and video footage surrounding these events.

189.     On September 21, 2019, Defendant Hernandez was responding to an alleged domestic violence dispatch call at an apartment complex and attempted to force himself into a 20-year-old woman's home after the woman refused his entry. Other deputies on scene warned the woman, "Let go of the door, or you're going to be tased." The woman told deputies, "I do not want to talk to you, especially Williamson County." The woman continued to deny deputies entry into her home and they attempted to place her in handcuffs. Suddenly and without provocation, Defendant Hernandez grabbed the woman by her chin and pushed her head against the wall and threatened to use his taser on her.

190.     Hernandez eventually pushed his way inside of the home despite the woman's assurances that the suspect was not inside. After clearing the home and not finding the suspect, Hernandez launched into a lecture about the woman failing to comply. Hernandez told her, "When we don't get your cooperation, that is what happens… All this screaming and all this shit does not make us stop. OK?"

191.     Chody suspended Hernandez for only one day following an internal affairs investigation of the encounter. Chief Deputy Tim Ryle said Hernandez's "failure

to properly deescalate the incident is unacceptable." Hernandez was promoted by Chody only two months after the encounter.

192.     Four months before being hired by Williamson County, Hernandez had left his .40 caliber handgun at a Wingstop restaurant. Hernandez was suspended without pay for only 12 hours.

193.     While at Williamson County, Hernandez quickly became one of the "star" deputies that was frequently featured on Live PD.

194.     Hernandez also had a strong personal relationship with Defendant Chody and would frequently assist with Chody's fundraising efforts. At one fundraiser where Hernandez was to be slammed through a wooden table by a professional wrestler, Hernandez decided to wear a t-shirt with the words "Tased and Confused" printed on the t-shirt.

195.     Deputy Mark Luera was one of the Live PD "stars" that was frequently featured on the television show and participated in dramatized traffic stops, SWAT raids, and cases of excessive force to create entertaining television for Live PD and increase his own celebrity.

196.     In June 2019, Defendant Chody took a selfie with Defendant Luera and captioned the image "A true leader." Chody also referred to Luera as a "Wilco Rock Star."

197.     In November 2017, Luera was employed with the Austin Police Department. An internal investigation was being done concerning Luera's participation in a special human trafficking detail at the city's airport. Luera was being investigated for using his special clearance badge at least 9 times to allow his family and friends to bypass TSA security for a flight to Cancun, Mexico. Luera repeatedly lied

about who he was traveling with and other details surrounding the use of his
special clearance badge. Luera's actions and dishonesty resulted in the loss of his
security license, a $370 fine to the Austin Municipal Court, and a $2,000 federal
fine.

198.    In a November 3, 2017 disciplinary report surrounding Luera's conduct, Austin
police chief Brian Manley stated, "His dishonest statements during the criminal
investigation will compromise his credibility as a witness if he continues to serve
as a police officer."

199.    When the Austin Police Department planned to fire Luera at a disciplinary
hearing in November 2017, Luera instead resigned and was hired by Defendant
Chody and the WCSO just three days after resigning from the Austin Police
Department.

200.    Williamson County stated it was aware of Luera's "honorable and meritorious
service," as well as the "findings in the incident where he made mistakes."

201.    Within 18 months of being hired by the County, Luera was promoted by Chody to
detective. Four months after this promotion, Chody bypassed the traditional
promotional process and promoted Luera to lieutenant in charge of the County's
training academy.

202.    Luera's speedy promotions was directly correlated to Chody's desire to see his
Live PD "stars" become more permanent fixtures on the show and within the
WCSO.

203.    On May 2, 2019, Chody sent Luera to lead a dramatic and unnecessary SWAT
raid on Asher Watsky's home during the filming of Live PD. Approximately two

weeks before the raid, a warrant had been issued for Watsky's arrest. In fact, earlier that day on May 2, Watsky and his attorney appeared in court regarding Watsky's criminal case. Rather than executing the warrant at the courthouse and arresting Watsky, Luera, County staff and producers with Live PD were incentivized to execute arrest warrants in dramatic fashion for Live PD entertainment.

204.    Chody and Luera's SWAT raid on Watsky's home involved armored vehicles, militarized weapons, a battering ram, and a smoke bomb that was utilized prior to entering Watsky's home. The staged raid was filmed for the purposes of showing the event on Live PD and to showcase the County's aggressive policing tactics.

205.    On April 21, 2019, Deputy Christopher Pisa used unnecessary and excessive force on Imani Nembhard after pulling her over for a minor traffic violation. In fact, Pisa pulled Nembhard over for failing to have a front license plate on her vehicle – the same offense that Plaintiff was pulled over before he was brutally attacked by Deputy Defendants.

206.    Pisa assaulted Nembhard without any legal justification by shoving his knee into her back, pulling multiple braids out of her scalp, and scraping her genitals across the pavement.

207.    In April 2019, supervisors within the County cleared Pisa of any wrongdoing. Later that year, in October 2019, Pisa was indicted by a grand jury for official oppression and assault causing bodily injury against Nembhard.

208.    The County rehired Pisa in January 2020, despite Pisa having been criminally indicted for his assault on Nembhard.

209.    Sheriff Mike Gleason, the current Sheriff of Williamson County, stated regarding

Pisa's use of force incident that, "I think a lot of those [other WCSO uses of

excessive force] were for entertainment value, and this one was just something

due to a lack of training."

210.    In another incident, Chody sent the SWAT team to arrest a suspect with a warrant

for drug possession. Chody and the SWAT team utilized a no-knock warrant and

flash bang grenades to create more entertaining television for Live PD.

211.    Deputies broke down the suspect's door, fired flash bang grenades into the home

an arrested the suspect on Live PD. Deputies unnecessarily used violence and

excessive force without any legal justification. Their purpose in bringing the

SWAT team and flash bang grenades was solely to produce entertaining

television for Live PD.

212.    On January 25, 2019, Scott Phillip Lewis was pulled over by a Williamson

County deputy for allegedly driving while intoxicated. The encounter was filmed

by Live PD and the deputy and production crew forced Lewis to wait until a film

crew arrived to begin the encounter. The deputy repeatedly remarked to the Live

PD camera that Lewis had urinated himself. The deputy's statements, and Live

PD's involvement in a routine traffic stop, had the effect of humiliating Lewis.

Lewis was physically restrained and assaulted during the arrest which resulted in

a broken shoulder.

213.    Chody also personally has a history of using excessive force. Prior to winning and

collecting on a $51 million jackpot, Chody was a police officer with the City of

Austin.

214.    In 1998 Chody encountered 15-year-old Marcus Frank and placed him in a chokehold while restraining Frank against his patrol vehicle.

215.    When Frank began to experience a seizure due to his epilepsy, Chody continued to restrain and hold Frank in the chokehold.

216.    The City of Austin paid a $30,000 settlement to resolve the claims against Chody. When asked about the incident later, Chody remarked that he had been a "good cop" and did nothing wrong.

**E. Live PD and County policy, practices and/or customs encouraged deputies to engage in excessive force for entertainment, resulting in drastic increase in use of force incidents within Williamson County.**

217.    Chody, as a Policymaker for the County, created a policy, practice and/or custom within the WCSO that encouraged excessive force and failed to supervise, train and discipline officers who committed excessive force.

218.    Despite the troubled history of misconduct and excessive force among each of the Deputy Defendants, Chody not only hired problematic deputies to the WCSO, but also actively promoted them within the department and commended their performances through social media.

219.    After the death of Javier Amble, Defendants Camden and Johnson were investigated for use of excessive force. Despite the pending investigation, Chody and the WCSO chose to allow Camden and Johnson to continue to patrol Williamson County, engage with the public, and commit further acts of violence. Camden and Johnson continued to be Live PD stars and were allowed to commit

the assault on Plaintiff absent any discipline for their conduct in the Ambler matter.

220.    Defendants Camden and Johnson were never placed on administrative leave, despite having killed Ambler and being the subject of an investigation.

221.    Officers engaged in "good" uses of force were rewarded with gift cards to steakhouses. Conduct among the Deputy Defendants and other deputies within the County were repeatedly ratified or failed to be investigated.

222.    The WCSO's internal policies states that a chokehold can only be used as a last resort. Despite this policy, the County, Chody and the WCSO ratified Defendant Luera's actions in assaulting and placing Mitchell in a chokehold, even while Mitchell was restrained and eventually handcuffed.

223.    Williamson County attorney Lisa Carson stated, "The policy classifies use of a chokehold as deadly force and prohibits it in all cases except where deadly force is necessary and justified and other methods of restraint are ineffective."

224.    Attorney Carson further explained, "Use of a chokehold by a WCSO deputy is prohibited in all cases unless it is the only option available to the deputy to protect him/herself or another person from immediate risk of death or serious bodily injury."

225.    Per the WCSO policy, deputies are requested to start with the lowest level of force appropriate. Defendant Deputies immediately resorted to punching, knee jabs and tasing despite a lack of justification for such uses of force.

226.    The County, Chody and the WCSO failed to take any disciplinary action against Defendant Luera or the Deputy Defendants. Defendant Luera, and any

surrounding deputies or individuals, were not at immediate risk of death or serious bodily injury. Nonetheless, Defendant Luera placed Mitchell in a chokehold and continue the restraint until and even after Mitchell was rendered unconscious.

227.    Three months after the death of Javier Ambler, Chody was in a live chat and decided to compliment Defendant Johnson and the Live PD show by saying, "You're doing an extremely good job and representing Wilco very well… I just wanted to say hello and how proud I am not only of J.J., but of all the troops that are on Live PD."

228.    Between 2017 (the last year before Live PD began filming in the County – and 2019 (after Live PD operated in the County for a full year – the number of use of force incidents doubled.

229.    During the weeks in which Live PD was being filmed in the County, deputies used force much more often than when they were not accompanied by Live PD camera crews.

230.    Use of force incidents rose in 2019 with the filming of Live PD compared to the previous year despite Williamson County's violent crime rate dropping by 7%.

231.    The number of incidents where tasers were used in the County nearly doubled from 2017 to 2019.

232.    Deputies used tasers in more than half of all use of force incidents between 2017 and 2019.

233.    Additionally, 55% of Williamson County's use of force incidents in 2019 occurred during the 29 weeks in which Live PD was filming in the County.

234.     More than 40% of deputies named in use of force reports since 2017 had been with the County for two years or less. In at least 12 cases, deputies involved had been employed for less than a year.

235.     Nearly three-quarters of use of force encounters during the 2017-2019 period resulted in injuries.

236.     The Austin American-Statesman analyzed 124 use of force incident reports from 2017 to 2019 and discovered that only two cases over the course of three years did supervisors find policy violations.

237.     In 2017, the County changed its training academy academic standards without permission from the Texas Commission on Law Enforcement. Although police officers in Texas are required to receive 5-7 months of training before working independently, in Williamson County that training period was reduced to 12 weeks due to Chody's insistence.

238.     Many deputies in Williamson County were allowed to patrol the county without receiving adequate and appropriate training, including the Deputy Defendants.

239.     Many of the Deputy Defendants had only recently been employed by the County before the assault on Ramsey Mitchell.

240.     Defendant Luera had been employed for less than 2 years prior to his assault on Mitchell.

241.     Defendant Camden had only completed academy training approximately 3 months prior to the assault on Mitchell.

242.     Defendant Johnson had only been on patrol for approximately 5-6 months prior to the assault on Mitchell.

243.     In November 2020, a bill was introduced in the Texas Legislature that would

prohibit law enforcement from working with reality television shows. On April

15, 2021, the bill was passed by the Texas House by a vote of 110 to 34.

## V.     CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 EXCESSIVE FORCE
### RAMSEY MITCHELL AGAINST ZACHARY CAMDEN, MARK LUERA, JAMES JOHNSON, CHARLES DUVAL, AND LORENZO HERNANDEZ

244.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

245.     Plaintiff would show that the actions of each of the Defendants named in this

Count on the date at issue in this Complaint deprived Mitchell of his

constitutional rights.

246.     Plaintiff would show that at all times material hereto, the Defendants had a duty

to avoid infliction of unjustified bodily injury to Plaintiff, to protect his bodily

integrity and to not trample on his constitutional rights.

247.     Plaintiff would show that the Deputy Defendants failed to act as objectively

reasonable officers would have acted in the same or similar circumstances. That

is, the Deputy Defendants, without legal or necessary justification or the need to

do so, used excessive force as described above and caused severe and lasting

physical injury to Plaintiff.

248.     The individual Defendants named herein witnessed and directly participated in the

conduct resulting in Plaintiff's injuries by applying unreasonable, unnecessary,

and excessive force to the Plaintiff while he was restrained by multiple law

enforcement officers, and took no action to stop the wrongful and unconstitutional

conduct of the other Defendants.

249.     Plaintiff would show that the Deputy Defendants denied Plaintiff his right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution.

250.     The actions by Deputy Defendants taken on that day were not objectively reasonable because they were designed to inflict excessive force in restraining an individual in a non-threatening situation that included several restraining deputies and other deputies who quickly arrived on scene.

251.     The unjustified and excessive force used by the Deputy Defendants was not reasonable, nor was it necessary under the circumstances. Plaintiff was restrained by five deputies, assaulted by closed-fist strikes, knee jabs, a chokehold, and multiple uses of the taser. When Plaintiff was handcuffed and unconscious, he continued to be assaulted with no reasonable justification.

252.     The force used by the Deputy Defendants was objectively unnecessary, excessive and unreasonable under the circumstances, as Plaintiff did not pose an immediate threat to the safety of the Deputy Defendants or others. The Deputy Defendants embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact did cause Plaintiff to suffer extreme and severe physical pain and injury, as well as mental and emotional distress, anxiety, terror and agony.

253.     As a result of the conduct by the Deputy Defendants, Defendants are liable to Plaintiffs for his injuries and resulting damages, either because they were integral participants in the use of excessive force or because they failed to intervene to prevent these violations.

PLAINTIFF'S ORIGINAL COMPLAINT                                      Page 40

## COUNT II: 42 U.S.C. § 1983 MUNICIPAL LIABILITY
### RAMSEY MITCHELL AGAINST WILLIAMSON COUNTY
### *Unconstitutional Custom, Policy or Practice*

254.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

255.     On and for some time prior to June 14, 2019 (and continuing to the present date) Defendants County, the WCSO, and Defendant Chody deprived Plaintiff of the rights and liberties secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, in that said Defendants and their supervising, and managerial employees, agents, and representatives, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, knowingly maintained, enforced and applied an official policy recognized by the County and the WCSO.

256.     The Deputy Defendants were acting under color of law.

257.     The Deputy Defendants acted pursuant to an expressly adopted official policy or a longstanding practice or custom of the Defendant County.

258.     On information and belief, none of the Deputy Defendants or Defendant Chody were terminated or disciplined for the unnecessary and unjustified assault on Plaintiff.

259.     Defendant County, together with Defendant Chody and other Policymakers, including the County Commissioners and supervisors maintained, inter alia, the following unconstitutional customs, practices, and policies:

   a.   Using excessive force;

   b.   Providing inadequate training regarding the use of force;

   c.   Providing inadequate training regarding the de-escalation of force;

d.  Lower the amount of training required to leave the training academy;

e.  Employing and retaining as law enforcement officers those who Defendant County and Defendant WCSO, at all times material herein, knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens through assault and excessive use of force;

f.  Inadequately supervising, training, controlling, assigning and disciplining law enforcement officers who Defendants each knew, or in the exercise of reasonable care, should have known had the aforementioned propensities and character traits;

g.  Employing and retaining officers who have been known to be abusive;

h.  Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling the intentional misconduct by those who are law enforcement officers;

i.  Failing to adequately discipline law enforcement officers for the above-referenced categories of misconduct and discipline that is so slight that is tantamount to encourage misconduct;

j.  Rewarding deputies with steakhouse gift cards when a use of force incident occurred;

k.  Rewarding deputies with titles such as "Wilco Badass" and featuring them on popular social media platforms and posts;

l.  Rewarding deputies who used force with appearances on Live PD and the notoriety that came with such national TV appearances;

m.  Having and maintaining an unconstitutional custom and practice of using excessive force and covering up police misconduct. These customs and practices

by the County, Chody and the WCSO were condoned by Defendants in deliberate indifference to the safety and rights of civilians, including the Plaintiff.

260.     By reason of the aforementioned policies and practices of Defendants County, the WCSO and their Policymakers, Plaintiff experienced severe pain and suffering for which he is entitled to recover damages. The aforementioned acts and omissions also caused Plaintiff's pain and suffering.

261.     Defendants County, Chody, and the WCSO together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as stated above, these Defendants encouraged, condoned, tolerated and through actions and inactions ratified such policies. Said Defendants also acted with deliberate indifference to both the foreseeable effects and consequences of these policies and to the constitutional rights of Plaintiff, and other individuals similarly situated.

262.     By perpetuating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendants County, Chody, and the WCSO acted with an intentional, reckless, callous disregard for the well-being of Plaintiff and his constitutional and human rights. Defendants' actions were willful, wanton, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities.

263.     Furthermore, the policies, practices, and customs implemented, maintained and still tolerated by Defendants County, Chody, and the WCSO were affirmatively linked to, and were a significantly influential force behind the Plaintiff's injuries.

## COUNT III: 42 U.S.C. § 1983 MUNICIPAL LIABILITY
## RAMSEY MITCHELL AGAINST WILLIAMSON COUNTY
### *Failure to Train*

264.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

265.     Williamson County is liable for all damages suffered by Plaintiff pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and 42 U.S.C. § 1983 based on an official policy or custom of the WCSO of which the County Commissioners and Defendant Chody all had actual or constructive knowledge that was a moving force behind the constitutional violations alleged herein.

266.     The conduct of the Deputy Defendants as set forth in the preceding paragraphs evinces the excessive and unreasonable use of force in violation of Plaintiff's constitutional rights.

267.     The conduct set forth supra evinces a custom of using excessive or improper force, a lack of policies and training instructing deputies on the appropriate manner in which to handle individuals through non-lethal tactics, including the use of tasers, strikes to the head and body of detainees, knee thrusts to the face, head and body, headlocks/chokeholds and restricting the breathing of detainees when no immediate risk of harm is posed to deputies or the public.

268.     With respect to the claims made the basis of this lawsuit, the County and the WCSO failed to adequately train, supervise or discipline its employees regarding the unnecessary use of excessive force. The failure to train, supervise or discipline its employees in a relevant respect reflects a deliberate indifference on the County, WCSO, Defendant Chody to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

269.     Defendant County and Defendant Chody developed and maintained a policy of deficient training of its police force in the appropriate use of force against suspects who are not resisting. The County's training is designed and implemented by Defendant Chody and the County to act in this regard.

270.     The County and Chody's failure to provide adequate training to its sheriff deputies regarding the use of excessive force reflect deliberate indifference by the Policymakers and reckless and conscious disregard for the obvious risk that officers would use excessive on citizens and made the violation of Plaintiff's constitutional rights, including his severe injuries, a reasonable probability.

271.     Deputy Defendants were acting under the color of law and acting pursuant to customs, practices and policies of the County and the WCSO in regards to the use of excessive force as authorized and/or ratified by the Policymakers, specifically Defendant Chody and the County when they deprived Mitchell of rights and privileges secured to him by the Fourth Amendment to the United States Constitution and by other laws of the United States, by the County failing to provide proper training in the use of excessive force in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

272.     On information and belief, Defendant County, the WCSO, and Defendant Chody, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of Plaintiff, failed to implement and/or enforce the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to Plaintiff and

implemented policies, procedures, and practices which actually interfered with or prevented Plaintiff from receiving the protection, assistance and care he deserved.

273.    The WCSO academy changed academic standards without approval to make it easier for some cadets to graduate from the academy and begin patrol.

274.    For instance, the following conduct, policies, and customs, *inter alia*, by Defendants violated Mitchell's constitutional rights:

a.    The inadequacy of WCSO's policies, training, supervision or discipline relating to the use of excessive force;

b.    The inadequacy of WCSO's policies, training, supervision or discipline relating to the use of non-lethal force and tactics, including the use of closed-first strikes, repeated use of tasers, use of headlocks/chokeholds, and kneeling on suspects;

c.    The adoption of completely subjective continuum of force policy that can be expressly avoided and which leaves the use of excessive force exclusively to the unchecked discretion of officers on the scene;

d.    The adoption of a policy that allows officers to use the degree of force that the officer feels brings the situation quickly under control as per his or her individual judgment even if that method is excessive force;

e.    Lack of training in regard to effective communication with citizens while giving them commands and determining their compliance.

f.    Using excessive force against Mitchell although he caused no immediate threat; and

g.    Using excessive force against Mitchell while he was detained and not resisting.

275.     The County's failure to properly train, supervise and discipline its police officers regarding the use of force was the proximate cause of the violation of Mitchell's constitutional rights.

## COUNT IV: 42 U.S.C. § 1983 MUNICIPAL LIABILITY
### RAMSEY MITCHELL AGAINST WILLIAMSON COUNTY
#### *Failure to Supervise and/or Discipline*

276.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

277.     On Plaintiff's governmental liability claim against the County for failing to supervise and/or discipline its officers for prior violations and the resulting lack of supervision:

    a.  The County and Defendant Chody failed to adequately supervise and/or discipline its employees in handling usual and recurring situations with which they deal;

    b.  The County and Defendant Chody were deliberately indifferent to the need to supervise and/or discipline its officers and/or employees adequately;

    c.  The failure to adequately supervise and/or discipline its officers proximately caused the deprivation of Mitchell's constitutional rights; and

    d.  The County and Defendant Chody failed to adequately supervise and/or discipline the Deputy Defendants for assaulting Mitchell for no lawful reason, resulting in the severe injuries to Mitchell.

278.     Despite having knowledge of the Deputy Defendants' violations of the policies and other best police practices as described above, the County, WCSO, and Defendant Chody failed and/or refused to adequately discipline the Deputy Defendants. The County's Policymakers were well aware of the out-of-control behavior of the Deputy Defendants but have failed to take any actions. The

County's failure to adequately supervise and/or discipline its deputies was therefore the moving force behind Plaintiff's damages.

## COUNT V: 42 U.S.C. § 1983 SUPERVISORY LIABILITY
### RAMSEY MITCHELL AGAINST ROBERT CHODY

279.　Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

280.　Defendant Chody, as the elected Sheriff in Williamson County, maintained, encouraged, implemented and ratified unconstitutional policies with deliberate indifference to the constitutional violations that directly caused the excessive force administered by the Deputy Defendants against Plaintiff.

281.　Defendant Chody, as the final Policymaker, acting under color of law, has a history of ratifying unreasonable and unnecessary uses of force.

282.　Defendant Chody, as the final Policymaker, acting under color of law, who had final policymaking authority concerning the Deputy Defendants' actions ratified the actions taken by the Deputy Defendants and the bases for them. Defendant Chody knew of and approved of the individual Defendants' acts.

283.　Defendant Chody and the WCSO has determined that the actions of the Deputy Defendants were within policy.

284.　The aforementioned acts and omissions caused Plaintiff's pain and serious injuries.

285.　The following unconstitutional policies were maintained and implemented by Chody and the WCSO:

　　　a.　Defendant Chody encouraged the use of excessive force by rewarding deputies who had encounters involving use of force with gift cards to steakhouses;

b.   Defendant Chody encouraged the use of excessive force by promoting Live PD and enlisting a select group of deputies, including the Deputy Defendants, that would serve as Live PD "stars" within the television program and the WCSO;

c.   Defendant Chody encouraged the use of excessive force by giving deputies who used excessive force the name "Wilco Badass";

d.   Defendant Chody encouraged the use of excessive force by hiring deputies, including the Deputy Defendants, who had past histories of excessive force and misconduct;

e.   Defendant Chody encouraged the use of excessive force by failing to supervise, discipline or otherwise counsel deputies, including the Deputy Defendants, when they used excessive force;

f.   Defendant Chody encouraged the use of excessive force by failing to train deputies, including the Deputy Defendants, on de-escalation, appropriate use of force, the use of tasers, non-lethal policing tactics and how to appropriately conduct traffic stops;

g.   Defendant Chody encouraged the use of excessive force by ignoring the dramatic increase in cases of excessive force within the county that coincided with the filming of Live PD; and

h.   Defendant Chody encouraged further misconduct by continuing to film with Live PD despite the County instructing him to cease filming with Live PD

### COUNT VI: ASSAULT AND BATTERY
### RAMSEY MITCHELL AGAINST ZACHARY CAMDEN, MARK LUERA, JAMES JOHNSON, CHARLES DUVAL, AND LORENZO HERNANDEZ

286.   Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

287.     On June 14, 2019, Deputy Defendants, while acting within the course and scope of their duties as law enforcement officials for the WCSO, without provocation, necessity or legal justification, assaulted and battered Plaintiff by repeatedly punching, kicking, tasing, choking and thrusting their knees while attacking Mitchell while he was being restrained with unreasonable and excessive force and violence, thereby causing Mitchell's injuries as herein described.

288.     On information and belief, Plaintiff alleges that Defendant County, WCSO, and its Policymakers are responsible for implementing, maintaining, sanctioning, ratifying, and/or condoning a policy, custom, or practice under which the Deputy Defendants committed the aforementioned illegal and wrongful acts.

289.     On information and belief, Plaintiff alleges that Defendant County, WCSO, and its Policymakers are each liable for the injuries and damages sustained by Plaintiff as they knew, or should have known, the customs, practices, policies would enable the unlawful and unconstitutional acts of the Deputy Defendants.

290.     As a result of all Defendants' acts and omissions as described, Mitchell suffered a traumatic and brutal assault by the Deputy Defendants that led to life-altering injuries.

291.     Defendants each committed the aforementioned acts and omissions knowingly, willfully, maliciously and with the expressed intent to harm Mitchell and conscious or reckless disregard for the harm that resulted from the assault. By reason thereof, Plaintiff seeks punitive and exemplary damages from Defendants, in an amount according to proof at trial.

## COUNT VII: NEGLIGENCE AND GROSS NEGLIGENCE
### RAMSEY MITCHELL AGAINST A&E NETWORK AND
### BIG FISH ENTERTAINMENT

292.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

293.     Defendants A&E Network and Big Fish Entertainment acted negligently in the development, production, shooting, editing, release and handling of Plaintiff as a subject on Live PD.

294.     Defendant A&E Network and Big Fish Entertainment owed Plaintiff a duty to exercise reasonable care in the editing, production, shooting, editing, release and handling of Plaintiff's image and likeness on national television.

295.     The injuries Plaintiff sustained and resulting damages were directly and proximately caused by the negligence of A&E Network and Big Fish Entertainment. Defendant breached its duty by developing, producing, shooting, editing, releasing and handling Plaintiff's image and likeness in such a way as to portray him as a drug addict, despite no evidence to suggest Plaintiff was a drug addict.

296.     Defendants' production and handling of Plaintiff's image and likeness was done in accordance with Defendant's pattern and practice of encouraging deputies on Live PD to engage in excessive force which led to Plaintiff's assault and serious injuries.

297.     Defendants' production of Live PD in Williamson County involved encouraging deputies to seek out encounters that would make for entertaining television. In the event that an encounter was not entertaining enough, Defendant's production

would encourage deputies to engage in dangerous police tactics, including the use of excessive force.

298.     Defendants conspired with Defendants County, Chody and the Deputy Defendants to encourage deputies to engage in excessive force for the chance to be featured on Live PD and be labeled a "Wilco badass" and "Rockstar" due to the high cable television ratings surrounding Live PD.

299.     Defendants' desire for high ratings and entertaining content created an environment where Plaintiff was subjected to harassment and physical and mental harm. The harm continued with the airing of Plaintiff's image and likeness on Live PD with the episode that sought to criminalize Plaintiff in a situation in which he was the victim.

300.     Defendants' desire for high ratings and entertaining content further created an environment that encouraged the Deputy Defendants and Defendant Chody to prey on the vulnerabilities of those under their control for the purpose of earning revenue and profit.

301.     Defendants' desire for high ratings and entertaining content allowed for the national broadcasting of law enforcement brutally assaulting Plaintiff for the purpose of earning revenue and profit.

302.     Defendants failed to take into account the WCSO's history of misconduct, and the Deputy Defendants' history of misconduct and excessive force, when Defendants decided to continue filming and broadcasting the Deputy Defendants on patrol. This occurred even after the County had terminated its access agreement with Big

Fish Entertainment. This had the effect of further encouraging the Deputy Defendants to engage in excessive force.

303.     Defendants continued to allow the filming of Live PD in Williamson County even after the County terminated the access agreement and issued a cease and desist letter.

304.     Defendants and their Live PD crew forced Plaintiff to wait in his car despite already having been pulled over by law enforcement. Defendants had a policy and practice of ensuring that a film crew arrived on scene to film the Deputy Defendants in their encounters, even if it meant delaying an interaction surrounding a traffic stop.

305.     Defendants failed to act as reasonably prudent people or entities would act under the circumstances.

306.     Defendants failed to obtain a signed media release from Plaintiff yet continued with the unaltered production and airing of Plaintiff's image and likeness, without Plaintiff's consent and without obscuring Plaintiff's face, image, and likeness on national television. Defendants' actions were done intentionally because of the "exciting" nature of the encounter with Plaintiff.

307.     Defendants created an unreasonably dangerous environment that encouraged and caused the harm complained of herein.

## COUNT VIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**RAMSEY MITCHELL AGAINST WILLIAMSON COUNTY, ROBERT CHODY, ZACHARY CAMDEN, MARK LUERA, JAMES JOHNSON, CHARLES DUVAL AND LORENZO HERNANDEZ**

308.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

309.     Defendants intentionally and/or recklessly engaged in extreme and outrageous conduct that caused Plaintiffs severe emotional distress.

310.     The intentional and/or reckless conduct of Defendants against Plaintiff was extreme and outrageous. The use of excessive force, the County's policies and procedures encouraging such use of force, and Defendants' desire for appearances on Live PD was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of reason.

311.     The conduct of Defendants did cause Plaintiff emotional distress by the use of excessive force and the national broadcast of Plaintiff's assault without Plaintiff's permission to air his image or likeness.

312.     The emotional distress suffered by Plaintiff was severe. Plaintiff has developed extreme anxiety surrounding his assault and the public nature of the incident given Live PD's involvement. Furthermore, the distress and physical and mental injuries he suffered while being incarcerated for after this encounter was severe.

313.     As a direct result of the illegal conduct of Defendants, Plaintiff has suffered injury and damages.

## COUNT IX: CIVIL CONSPIRACY
## RAMSEY MITCHELL AGAINST ALL DEFENDANTS

314.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

315.     Deputy Defendants, Defendant Chody, A&E Network and Big Fish Entertainment entered into an agreement or understanding, explicitly or implicitly, for the purpose of injuring Plaintiff by:

a. Encouraging deputies to use excessive force, behave unlawfully and improperly during interactions with the public for the purpose of producing entertaining television within the Live PD program;

b. Collectively deciding that more entertaining content would need to be generated by Williamson County in order for Live PD to continue filming within the County;

c. Designating certain deputies, including Deputy Defendants, as Live PD "stars" who would focus their duties on assignments with Live PD;

d. Airing video footage on national television of Plaintiff being arrested, assaulted and being characterized as a "druggie" for the purpose of generating profit for A&E Network and Big Fish Entertainment;

e. Airing video footage on national television of Plaintiff being arrested, assaulted and being characterized as a "druggie" despite Plaintiff's refusal to sign a media release form; and

f. Such other conduct as the evidence may show.

## VI.   DAMAGES

316.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

317.    **Actual damages.** Defendants' acts and/or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiff and Defendants should be held jointly and severally liable for the following damages:

a. **Ramsey Mitchell (Excessive Force)**

   i.  Actual Damages;

      ii.   Disfigurement;

     iii.   Conscious pain and mental anguish suffered by Ramsey Mitchell;

     iv.   Mental anguish and emotional distress sustained as a result of Defendant
Lordi's excessive force.

**Punitive/Exemplary Damages against all Defendants.** Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Here, the conduct of the Deputy Defendants, Defendant Chody and Big Fish Entertainment was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of the Plaintiff. As such, Plaintiff requests punitive and exemplary damages to deter this type of conduct in the future.

318.     Prejudgment and post judgment interest.

319.     Costs of court.

320.     Reasonable and necessary attorney's fees incurred by the Plaintiff through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

321.     Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the court.

## VII.   <u>TRIAL BY JURY</u>

322.     Plaintiff has paid a jury fee and demands trial by jury.

## VIII.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiff recovers judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

Respectfully Submitted,

By: */s/ Blerim Elmazi*
Blerim Elmazi, Esq.
State Bar No. 24118375
ELMAZI LAW FIRM, PLLC
1910 Pacific Avenue, Suite 8000
Dallas, Texas 75201
Telephone: (817) 734-2949
Blerim@ElmaziLaw.com
(Pro Hac Vice Petition Forthcoming)

*/s/ Adam Malik*
Adam A. Malik
State Bar No. 24094151
MALIK & ASSOCIATES, PLLC
P.O. Box 110251
Carrollton, TX 75011
Telephone: (214) 881-2100
AMalik@MalikFirm.com
(Local Counsel)

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2021, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

*<u>/s/ Blerim Elmazi</u>*
**Blerim Elmazi**
